**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JOHN MICHAEL ROLPH, II | * | |
| Plaintiff | * | |
| v | * | Civil Action No.  ELH-16-594 |
| DEBORAH RICHARDSON, *et al*. | * | |
| Defendants | * | |

\*\*\*

## MEMORANDUM OPINION

The self-represented plaintiff, John Rolph II, filed a civil rights complaint when he was hospitalized at Spring Grove Hospital (ECF 1), and amended it when he was incarcerated as a pretrial detainee at the Baltimore County Detention Center ("BCDC").  ECF 5.  Of relevance here, Rolph alleges that BCDC Warden Deborah Richardson and Program Manager Sharon Tyler, defendants, refused to provide him with a religious diet, failed to provide him with adequate medical care, and subjected him to improper conditions of confinement.  *See* ECF 5 (Amended Complaint).  Defendants have moved to dismiss or, in the alternative, for summary judgment.  ECF 20 ("Motion").  Plaintiff has not opposed the motion, but was advised of his right to do so and of the potential consequences of failing to file a response to the Motion.  ECF 23.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons that follow, defendants' Motion shall be construed as a motion for summary judgment and shall be granted.  Judgment shall be entered in favor of the defendants.

### I.    Factual and Procedural History

The original Complaint was filed by plaintiff when he was hospitalized at Spring Gove Hospital (ECF 1), and it contained two disparate claims.  The first was a claim asserted by

plaintiff against his father for the unauthorized sale of plaintiff's motor vehicle during plaintiff's incarceration.  I dismissed that claim on March 2, 2016, because it did not state a claim under 42 U.S.C. §1983.  *See* ECF 3; ECF 4.  The second claim pertained to Spring Grove Hospital. Plaintiff alleged that he was not receiving proper medical care for multiple deteriorating and bulging discs; an anxiety disorder; a large abdominal hernia; and post-traumatic stress disorder. ECF 1 at 6 – 10.  Because Spring Grove Hospital is not a "person" within the meaning of 42 U.S.C. §1983, but the allegation otherwise stated a colorable claim, plaintiff was granted 28 days to supplement the claim by naming the individual staff members allegedly responsible for the failure to provide proper care.  ECF 3; ECF 4.

Plaintiff's supplemental complaint (ECF 5) did not address the allegations regarding his medical care at Spring Grove.  Rather, the supplemental complaint raised entirely new claims against the Warden and the Program Director at BCDC and did not reference the claims arising at Spring Grove.  ECF 5.  Therefore, the supplemental complaint is more properly viewed as an Amended Complaint under Fed. R. of Civ. Proc. 15.

"An amended pleading ordinarily supersedes the prior pleading.  The prior pleading is in effect withdrawn as to all matters not restated in the amended pleading." *Nisbet v. Van Tuyl*, 224 F.2d 66, 71 (7th Cir. 1955) (citing 71 C.J.S., Pleading, § 321 at 717).  Thus, the only claims addressed herein will be those raised in the Amended Complaint (ECF 5).

## II.    Amended Complaint

Plaintiff states that he arrived at BCDC on March 8, 2016, and went through the intake process the day he arrived.  ECF 5 at 3.  Plaintiff states he showed the nurse[1] with whom he spoke at intake "documentation that [he] converted to Judaism approximately eight months ago."

---

[1] Plaintiff does not provide the nurse's name, nor is she named as a defendant.

ECF 5 at 3.  Further, he informed her that he was "on a kosher diet" and asked her to "enter that on the computer."  *Id*.  He claims he showed the nurse "one of two papers" he had with him "proving [his] Jewish faith."  *Id*.

Although plaintiff believes the nurse entered the information regarding his religious preference into the computer, he states that he was denied kosher meals.  ECF 5 at 3.  He states that from March 8, 2016 through March 14, 2016, all he had to eat was "two eggs and a bag of chips."  *Id*.  Plaintiff claims he "wrote multiple 118s to everyone" at BCDC in an effort to obtain his religious diet.  *Id*.  Specifically, he states he wrote to "multiple shift captains, . . . the head hancho in charge of the meals," church services staff, and to the defendants, Program Director Sharon Tyler and Warden Deborah Richardson.  *Id*.

In addition to plaintiff's request for kosher meals, he informed BCDC staff in his written correspondence that he was allergic to turkey, beef by-products, white bread, and sugar.  *Id*.  Plaintiff explains that he experiences allergic reactions when exposed to these food items, causing his throat to close and producing hives on the back of his arms.  *Id*.  According to Rolph, he had to fast due to his multiple food allergies.  *Id*.

On March 14, 2016, Rolph received a letter from Tyler stating that he would need to provide the name of his Rabbi and synagogue in order for him to be approved for a kosher diet.  ECF 5 at 3.  Further, Tyler informed plaintiff that Richardson forwarded to the medical staff the information regarding plaintiff's food allergies.  *Id*.  Plaintiff responded to Tyler's letter, indicating that he had shown the intake nurse proof of his religion; that Tyler could see the paperwork he had proving his religious preference; he was "absolutely starving"; and he was invoking his "fifth amendment rights as far as the personal information she requested."  *Id*.

Rolph also points out that he is "obviously new to the [Jewish] faith," but claims that he studies every day and feels "horrible" that he has been "forced . . . to come close to fasting totally." ECF 5 at 5. According to plaintiff, defendants were "forcing [him] to break [his] faith by consuming their regular meals." *Id.* He also points out that he had a kosher diet for the eight months that he was at Spring Grove Hospital. *Id.*

In addition, plaintiff claims that when he got to BCDC he was "placed on a boat [sic] (on the floor)," despite his having informed correctional staff that he has a prior diagnosis of a "deteriorating disc, protruding disc, bulging disc, and sciatica problems." ECF 5 at 4. Plaintiff states that he told "the sheriff's deputy that [he] needed to be placed on a bunk (bottom) and [he] needed an extra mat for [his] back." *Id.* at 3. The sheriff told Rolph that "the best [he] can do" for plaintiff was to provide him with a "boat [sic] on the floor." *Id.* at 5. Plaintiff claims that his "back locked up" because he was forced to sleep on the floor. *Id.* at 3. After sleeping on the floor, plaintiff claims it felt as though he had a pinched nerve so he went to the medical department, where he received an x-ray. *Id.* at 4.

Despite the pain plaintiff claims he experienced, he was still required to sleep on a "boat" on the floor and was simply moved to a different housing unit, which he refers to as the "crazy side." ECF 5 at 4. When plaintiff asked to be moved to the medical housing unit, he was told he had to be cleared by psychiatry before he could be moved. *Id.* Plaintiff states that he "subpoenaed [his] arrest records" and discovered notations that he was psychotic and schizophrenic. *Id.* Plaintiff disputes those diagnoses and states that he had been cleared by Spring Grove as "100% mentally competent." *Id.* at 5. But, he also states: "Please know I want to go back to Spring Grove . . . ." *Id.* at 4.

Plaintiff explains that in the housing unit where he was kept (2C), "they kick on the doors all hours of the day and night and scream loudly."  ECF 5 at 4.  Further, Rolph asserts that the noise causes an increase in his anxiety.  *Id*.  Plaintiff states that he had been remanded to Spring Grove on March 4, 2016, following a court appearance and a "nervous breakdown" he experienced as a result of not receiving his medication, Clonazepam.[2]  *Id*.  He explains he was sent to Spring Grove so that his medication could be straightened out; that he was much happier when he was there because a social worker was helping him to find a place to live so he could complete his sentence on home detention; and that he needs to go back to Spring Grove to get his medication corrected again.  *Id*.  He claims he should not have been removed from Spring Grove because it violated a judge's order remanding him there.  *Id*. at 5.

Under a heading titled "negligence" plaintiff adds that staff at BCDC were not doing enough to find him a permanent residence and had only provided him with a list of homeless shelters.  ECF 5 at 5.  Further, he alleges that he was having "panic attacks all day long" and a nervous breakdown, "possibly caused by not being detoxed properly off my medication."  *Id*.  He states he was taking narcotics twice a day for eight months and "they gave [him] Librium for detox" but that he had an allergic reaction to it.  *Id*.  He adds that he had a staph infection in his nose causing it to be "swollen and bright red," but adds he was being sent to "see medical tomorrow."  *Id*.  In addition, Rolph claims that he had an open wound that was caused by Dr. Sabba[3] at Spring Grove, because he ordered a larger abdominal binder,[4] causing the wound.  *Id*.

---

[2]  Clonazepam is a benzodiazepine.  It affects chemicals in the brain that may be unbalanced and is prescribed for treatment of seizures and panic disorders.  *See* https://www.drugs.com/clonazepam.html

[3]  Dr. Sabba is not a named defendant.

[4]  Plaintiff suffered a wound to his abdomen and the binder was ordered for its treatment.

### III.   Defendants' Response

In support of the Motion, Tyler provided an Affidavit explaining that she is the Program Manager at BCDC, and she is responsible for supervising all inmate programs, including religious services.  ECF 20-2 at 1 – 2, ¶5.  Further, she avers that when plaintiff was admitted to BCDC on March 8, 2016, he identified his religion as Roman Catholic.  *Id*. at 2, ¶8; ECF 20-4; ECF 2-5.

On March 11, 2016, Tyler received an Inmate Request Form #118 dated March 20, 2016, from plaintiff stating that he had been on kosher meals for religious reasons for the past eight months while he was confined at Spring Grove State Hospital.  ECF 20-2 at 2, ¶ 9.  Plaintiff stated that he needed to be placed on a kosher diet "ASAP" and also claimed he was allergic to turkey, beef byproducts, and white bread.  *Id*.  In response to plaintiff's Inmate Request Form, Tyler wrote the following on March 11, 2016, ECF 20-5:

> I reviewed your file and it indicates you have reported to be Roman Catholic every time you have been admitted to BCDC; please provide me with the name of your Rabbi and congregation and once the information is confirmed you will be provided with kosher meals; and Director Richardson has forwarded your dietary allergies to medical to resolve.

*See also* ECF 20-2, ¶ 10.

On March 15, 2016, Tyler received two more Inmate Request forms from plaintiff, repeating his request for kosher meals and claiming food allergies.  ECF 20-2 at 2 – 3, ¶ 11.  Plaintiff also threatened legal action if his request for kosher meals was not granted.  *Id*.  And, plaintiff claimed that he was "'absolutely starving.'"  *Id*. at 3, ¶ 12.

Despite plaintiff's claims that he was starving, Tyler notes that plaintiff's commissary receipts indicate that as soon as he had money in his inmate account, he bought numerous packages of Ramen (beef), five beef jerky packages, tuna packages, a cinnamon roll, and an iced

honey bun.  *Id*.  Tyler also notes that many kosher meals contain beef and turkey products and further notes that all of the items plaintiff purchased at the commissary are contraindicated for his stated food allergies and to a kosher diet.  *Id*. at ¶13.

According to Tyler, while plaintiff claimed to have documentation proving his conversion to Judaism, he never provided it to her, despite her advice that he could not receive kosher meals absent such proof.  ECF 20-2 at 3, ¶ 14.  Tyler further advised plaintiff that none of the meals at BCDC included pork products and that he could request and receive a vegetarian meal.  *Id*.  Tyler states that Jewish religious services are provided for inmates on the first Wednesday of each month.  *Id*. at ¶15.  Representatives from Jewish Big Brothers and Sisters and Rabbi Yanki Dinovitz are available to meet with Jewish inmates at BCDC.  *Id*  Despite the availability of such services, plaintiff never attended the services nor did he request to meet with either Rabbi Dinovitz or a representative of the Jewish Big Brothers and Sisters.  *Id*. at 4, ¶ 16. In light of the discrepancies between what plaintiff claimed regarding his faith and his food allergies, Tyler concluded that plaintiff did not meet the requirements to receive kosher meals and that he simply requested kosher meals because he did not want to eat the institutionally prepared meals.  ECF 20-2 at 5, ¶ 20.

Further, Tyler explains that there is an increased cost to BCDC in providing kosher meals.  An institutionally-prepared meal costs $1.25 per meal.  ECF 20-2 at 4, ¶ 17.  However, because BCDC does not have a kosher kitchen, kosher meals must be ordered from an outside vendor at a cost of $6.28 per meal.  *Id*.  Tyler states that she is required by BCDC policy and directives to verify a request for a religious diet and either approve or deny it within seven days of receipt of the request.  *Id*. at ¶ 18.  Pursuant to that policy, Tyler denied plaintiff's request for kosher meals for multiple reasons: he indicated he was Roman Catholic on his intake statement;

he failed to provide the name of his Rabbi; he failed to provide the name of his congregation; he failed to provide documentation of his conversion, which he claimed to have in his possession; he did not participate in any of the programs established for Jewish inmates; he made commissary purchases of beef products despite his claimed allergies to same; and because of the increased cost involved in providing a kosher meal.  *Id*. at 4–5, ¶ 19.

Bonita Cosgrove, the Medical Liaison for BCDC, investigates inmate complaints regarding medical services provided to inmates at BCDC by the contractual medical services provider, Correct Care Solutions.  ECF 20-3 at 1, ¶¶ 2 – 4.  In Cosgrove's Affidavit, she explains that on March 10, 2016, plaintiff informed a nurse that he was not eating because he was not receiving kosher meals.  *Id*. at 2, ¶ 7.  In response, plaintiff was advised that only program staff could approve religious diets and medical care staff were prohibited from doing so; plaintiff was notified of the proof required for a religious diet several times while at BCDC.  *Id*.

Although plaintiff indicated that he was allergic to turkey and beef products during his intake interview with a nurse, BCDC medical staff never received any official documentation of the allergies from an outside doctor or allergist.  ECF 20-3 at 2, ¶ 8.  Plaintiff did not provide the name of the physician who tested him for the allergies, despite requests for that information.  *Id*. Cosgrove states that, absent such documentation, a notation indicating a food allergy could not be placed into his jail record.  *Id*.  Further, she notes that it is not unusual for inmates to claim food allergies simply because they do not like the institutional food.  Moreover, she points out that when plaintiff was incarcerated at BCDC on July 31, 2016, he claimed an allergy to kiwi, but made no mention of an allergy to turkey or beef.  *Id*. at  2 – 3, ¶ 9.

With respect to plaintiff's physical and mental health issues, Cosgrove indicates that the intake nurse noted a history of gunshot wounds to plaintiff's abdominal area, right leg, and left

arm as well as a history of bipolar disorder, anxiety, and schizophrenia.  ECF 20-3 at 3, ¶ 10.

Plaintiff reported taking Clonazepam and Seroquel, both psychotropic medications.  *Id*.  Plaintiff

was referred to a nurse practitioner for a health assessment, which was performed the day of

intake, March 8, 2016.  *Id*. at ¶ 11.

During plaintiff's health assessment it was noted that he had an "umbilical wound," an

abdominal hernia, and that he suffers from chronic pain.  ECF 20-3 at 3, ¶ 11.  In addition,

plaintiff had a dependence on benzodiazepine, for which he was started on a detox protocol and

prescribed medication to address withdrawal symptoms.  *Id*. at ¶¶ 11, 13.  Plaintiff's umbilical

wound was immediately cleaned and dressed and orders were issued for daily wound care.  *Id*. at

¶ 12.  Plaintiff was also referred to the BCDC mental health care provider to evaluate his mental

health issues.  *Id*. at ¶ 13.

On March 10, 2016, plaintiff was seen for a psychiatric evaluation and he was prescribed

Seroquel.  ECF 20-3 at 3-4, ¶ 14.  The psychiatrist attempted to discuss medications to treat

plaintiff's anxiety in lieu of Clonazepam, but plaintiff was not interested in trying another

medication.  *Id*.  Following the psychiatric evaluation, plaintiff was placed in the mental health

unit and was seen weekly by a mental health clinician.  *Id*.

Plaintiff was seen by medical staff on March 14, 2016, in response to a sick call slip he

submitted, complaining of lower back pain.  ECF 20-3 at 4, ¶ 15.  An x-ray of plaintiff's lumbar

spine revealed degenerative disc disease, mild spondylosis, and minimal scoliosis, but no

evidence of a fracture or instability.  *Id*.  On March 19, 2016, plaintiff was seen again for

complaints of muscle spasms in his back.  *Id*. at ¶ 17.  At that time, plaintiff was prescribed

Motrin and Flexeril, a muscle relaxer, to treat his pain.  *Id*.

On March 16, 2016, plaintiff was seen again in response to a sick call slip in which he complained about a swollen nose. ECF 20-3 at 4, ¶ 16. A culture/swab was done and revealed that plaintiff had a methicillin resistant staph infection. *Id*. A physician prescribed the antibiotic Clindamycin, which was administered by BCDC medical staff. *Id*.

On April 4, 2016, plaintiff was seen for a follow-up evaluation of the umbilical wound, which the doctor noted was healing well. ECF 20-3 at 4, ¶ 18. He was seen again on April 19, 2016, for a complaint of skin irritation caused by the institutional soap; he was prescribed a topical steroid cream. *Id*. at ¶ 19. Plaintiff was not seen again before his release on April 29, 2016. *Id*. at 5, ¶ 21.

## IV. Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, ____ Fed. App'x ____, 2016 WL 6958439, at *2 (4th Cir. Nov. 29, 2016) (per curiam).

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC, supra*, at *2 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

11

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).   To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.   Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).   A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."   *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Plaintiff has not filed an affidavit under Rule 56(d). Moreover, I am satisfied that it is appropriate to address the defendants' Motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court

has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## V.   Discussion

### A.   First Amendment and RLUIPA claims

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). However, with respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). Nevertheless, the right is not unfettered. Prison restrictions that impact on the

free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution. *See Turner v. Safley*, 482 U.S. 78, 89-91 (1987).

In relevant part, the Religious Land Use and Institutionalized Persons Act ("RLUIPA" or the "Act"), 42 U.S.C. § 2000cc *et seq.*, states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §2000cc-1(a).

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005); *see Holt v. Hobbs,____* U.S. *____, ____*, 135 S.Ct. 853, 859–60  (2015); *Smith v. Ozmint,* 578 F.3d 246, 250 (4th Cir. 2009); *Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir. 2006).  Enactment of RLUIPA restored religious free exercise rights to prisoners, similar to those enjoyed by those who are not incarcerated.  *See Cutter*, 544 U.S. at 715-17.

The Act defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A); *Holt,* 135 S.Ct. at 860; *Smith.* 578 F.3d at 251.  A prison regulation imposes a substantial burden when it places "substantial pressure on an adherent to modify his behavior and to violate his beliefs" or "forces a person to choose between following the precepts of [his] religion and forfeiting

governmental benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand." *Lovelace*, 472 F.3d at 187.

Under RLUIPA, the inmate initially must show that the challenged policy substantially burdens his exercise of his religion. *See* 42 U.S.C. § 2000cc–2(b); *Holt*, 135 S.Ct. at 862.   The Act "prescribes a shifting burden of proof for inmate religious exercise claims."   *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015).   A prisoner must initially "demonstrate that the prison's policy exacts a substantial burden on religious exercise," and then the burden "shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means." *Id.*

In other words, the test to determine if the restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question.   In addition, the court must examine whether there are alternative means of exercising the right asserted; whether accommodation of the right will impact on the orderly operations of the prison; and whether readily available alternatives to the regulation would be less restrictive.

No substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his or her religion.  *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).  In *Incumaa*, 791 F.3d 517, the prisoner plaintiff maintained that prison officials were requiring his renunciation of his chosen religion in order to be reassigned to general population and no longer subjected to the stricter, more harsh conditions of segregation.   Evidence that prison officials allowed general population prisoners to maintain their affiliation with the religious group and that the plaintiff

was permitted to keep religious materials in his possession while segregated undermined his

claim that the goal of his segregated confinement was to force his renunciation.  *Id.* at 526.

Here, plaintiff claims he was denied his request for a religious diet and thus was denied

his constitutional right to practice his religion.  ECF 5.  However, Tyler's request for information

from Rolph confirming his professed faith does not amount to a constitutional violation.  In

*Cutter*, the Supreme Court said, 544 U.S. at 725 n.13:

> [[P]rison officials may appropriately question whether a prisoner's religiosity,
> asserted as the basis for a requested accommodation, is authentic. Although
> RLUIPA bars inquiry into whether a particular belief or practice is "central" to
> a prisoner's religion, see 42 U.S.C. § 2000cc-5(7)(A), the Act does not
> preclude inquiry into the sincerity of a prisoner's professed religiosity. *Cf.*
> *Gillette v. United States*, 401 U.S. 437, 457 (1971) ("'[T]he 'truth' of a belief
> is not open to question'; rather, the question is whether the objector's beliefs
> are 'truly held.'" (quoting *United States v. Seeger*, 380 U.S. 163, 185 (1965)).

Such a requirement is particularly relevant in instances where, as here, the prisoner himself

has provided conflicting information regarding his faith and there is a five-fold increase in cost

to the institution to accommodate the request.  Defendants are entitled to summary judgment in

their favor on this claim.

## B.  Claims Regarding Medical and Psychiatric Care

The constitutional protections afforded a pretrial detainee as provided by the Fourteenth

Amendment are coextensive with those provided by the Eighth Amendment.  *See Bell v. Wolfish*,

441 U.S. 520, 535 (1979).   "Due process rights of a pretrial detainee are at least as great as the

Eighth Amendment protections available to the convicted prisoner."  *Hill v. Nicodemus*, 979

F.2d 987, 991 (4th Cir. 1992) (citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue

of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173

(1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219,

225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d at 219; *Cf. Heyer v. Boyd*, ____ F.3d ____, No. 15-6826, slip op. at 13-14 (4th Cir. Feb. 13, 2017). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Scinto*, 841 F.3d at 225.

A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Heyer v. Boyd*, *supra*, slip op. at 14; *Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser*, 772 F.3d at 346 n.8.

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-

40; *Scinto*, 841 F.3d at 225. In order "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

"True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835); *see Heyer v. Boyd*, *supra*, slip op. at 17.  A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi*, 789 F.3d at 133 (quoting *Farmer*, 511 U.S. at 842).

Moreover, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

Even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Notably, because deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness," it follows that, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986).  What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), is also apt: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is

designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."

With regard to medical care providers, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge).

In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted) (*overruled in part on other grounds by Farmer,* 511 U.S. at 837; *aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.,* 621 Fed. Appx. 732 (Mem) (4th Cir. 2015). And, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Thus, inmates and detainees do not have a constitutional right to the treatment of their choice.  *Dean v. Coughlin*, 804 F.2d 207, 215 (2nd Cir. 1986).  And, mere disagreements as to the need for or the appropriate extent of medical treatment do not give rise to a constitutional injury.  *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

With regard to plaintiff's claims concerning medical care at BCDC, the undisputed record establishes that each of plaintiff's complaints were addressed in a timely manner. He was treated for back pain, the infection in his nose, as well as the umbilical wound. *See* ECF 20-3 (Cosgrove Affidavit). There is no evidence that either Tyler or Richardson knew of and disregarded a serious medical condition or that they prevented plaintiff from receiving proper care.

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id*. The *Bowring* Court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id*. at 48.

To the extent that plaintiff intended to raise a claim that he was denied proper care for mental health issues, the undisputed record establishes otherwise. Plaintiff was placed into a detox program when it was discovered that he was withdrawing from daily use of benzodiazepines and he was provided with both a psychiatric evaluation and daily monitoring by qualified staff. *See* ECF 20-3 (Cosgrove Affidavit). Again, there is no evidence that either of the named defendants interfered in the care needed or knew of additional care that was required and somehow refused to make it available.

### C.  Conditions of Confinement

The inquiry with respect to the conditions of confinement is whether those conditions amount to punishment of the pretrial detainee, because due process proscribes punishment of a detainee before proper adjudication of guilt.  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). However, "not every inconvenience that is encountered during pre-trial detention amounts to 'punishment' in the constitutional sense." *Martin v. Gentile*, *supra*, 849 F.2d at 870 (citing *Bell*, 441 U.S. at 538-40).

A particular restriction or condition of confinement amounts to unconstitutional punishment in violation of the Fourteenth Amendment if it is imposed by prison officials with the express intent to punish or it is not reasonably related to a legitimate, non-punitive goal.  *Bell*, 441 U.S. at 538-39 (restrictions or conditions that are arbitrary or purposeless may be considered punishment).  In determining whether the challenged conditions amount to punishment, it is not the province of this court to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given its due deference.  *See Sandin v. Conner*, 515 U.S. 472, 482-83 (1995).  "[A]bsent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded.  *See Wilson*, 501 U.S. at 298-99.  In other words, "'the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.'" *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

Plaintiff asserts that he was forced to live in an environment that exacerbated his post-traumatic stress disorder due to the noise on the housing unit where he was assigned; he was forced to go without food; and his back pain was exacerbated because he was forced to sleep on a mattress on the floor.  ECF 5.  With respect to plaintiff's assignment to the mental health unit where he claims the noise was intolerable, there is no evidence that the noise level would have differed greatly in any other part of the detention center.  Plaintiff's assertion that he was found "100% competent" by a doctor at Spring Grove, and his contradictory assertion that he should not have been removed from Spring Grove given his mental state, illustrates the difficulty the defendants faced in attempting to address adequately plaintiff's claimed needs.

"In formulating and executing decisions relating to cell assignments, we must allow prison authorities the discretion to take into account the particular safety and security concerns facing male inmates, even though such considerations result in disparate treatment based upon gender." *Veney v. Wyche*, 293 F.3d 726, 734 (4th Cir. 2002).  Clearly, assignment of plaintiff to the mental health ward, given his history of recent hospitalization at Spring Grove and his need for anti-psychotic medications, were a priority over his concerns regarding the noise in that unit.

With respect to plaintiff's claim that he was forced to go without food, the record evidence absolutely refutes that claim.  There is no evidence that plaintiff held a sincere religious belief requiring adherence to a kosher diet, nor is there any evidence that plaintiff could not eat the institutionally prepared food due to his claimed food allergies.  To the contrary, there is evidence that plaintiff himself did not restrict his diet to kosher food or food that did not contain his claimed allergens when he bought food items at the detention center's commissary.

Finally, plaintiff's claim that his back pain required his assignment to a lower bunk rather than providing him with a mattress to be used on the floor is without any evidence to support it.

Plaintiff fails to allege any facts that differentiate between those two assignments and how one would have been more beneficial to his back condition, nor is there any objective medical evidence to support a finding that he was injured as a result.  *See* ECF 20-3 at p. 4, ¶15 (x-ray results).  The discomfort plaintiff suffered is within the normal range of that experienced as a result of any inmate's incarceration and is not actionable.

## VI.     Conclusion

Defendants are entitled to summary judgment on all of the claims raised because there is no evidence to sustain plaintiff's allegations.  As such, this court need not reach defendants' defense of qualified immunity.

An Order follows.

<u>February 28, 2017</u>                    _____/s/_____
Date                                                 Ellen L. Hollander
                                                        United States District Judge